UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WILLIAM N. SPECHT,

        *Plaintiff*,

    v.

ESTHER SUAREZ et al.,

        *Defendants*.

No. 21-cv-18592 (MEF)(JRA)

**OPINION and ORDER**

**Table of Contents**

I.   **Background**
    A.   **The Facts**
    B.   **Procedural History**
    C.   **The Motion**
    D.   **The Court's Approach**
II.  **Conscientious Employee Protection Act**
    A.   **"Whistle-Blowing"**
    B.   **Causation**
III. **First Amendment Retaliation**
IV.  **Due Process**
    A.   **Employment**
    B.   **Reputation**
    C.   **The State Claim**
V.   **Wrongful Discharge**
VI.  **Conclusion**

\*    \*    \*

A local prosecutor was fired.

He sued the prosecutor's office and its leaders, alleging, among other things, that the firing violated federal law (because it was retaliation for First Amendment-protected statements) and New Jersey law (because he was entitled to whistleblower protection).

The various defendants now move for summary judgment, and the prosecutor moves for partial summary judgment.

The motions are granted in part and denied in part, as set out below.

                    *    *    *

I.    **Background**

    A.    **The Facts**

The relevant undisputed facts for now are as follows.

An individual[1] worked as a supervisory prosecutor in a county prosecutor's office in New Jersey.[2]  See Hudson County Statement of Material Facts (ECF 50-2) ¶¶ 6-7; Plaintiff's Statement of Undisputed Material Facts (ECF 51-2) ¶ 1.

An outside law firm was hired to conduct an investigation as to various across-the-workplace issues.

The outside lawyers interviewed a substantial number of people; in October 2020, they interviewed the supervisory prosecutor. See Certification of Counsel in Support of Motion for Summary Judgment (ECF 50-1) ("Scott Certification"), Exhibit 2 at County 0472.

Per the report the outside lawyers later wrote, "the purpose" of the October 2020 interview was to ask the supervisory prosecutor about a Wall Street Journal opinion piece he had posted on his Facebook account.  See id.  Other subjects, related to general workplace issues, were also covered during the October 2020 interview.  See id. at County 0472-73.

Over the months that followed, additional Facebook posts from the supervisory prosecutor were forwarded to the outside lawyers.  See id. at County 0473.  Like the Wall Street Journal

---

[1]  William N. Specht.

[2]  The Hudson County Prosecutor's Office.

piece, each of these Facebook posts was focused, in part, on matters of public interest.  See id. at County 0467-68.

In March 2021, the supervisory prosecutor sent a message in a workplace Slack group chat,[3] saying that a particular software platform used by the county prosecutor's office "identifies as Mexican.  It sleeps when the sun is hottest."  See Hudson County Statement of Material Facts ¶¶ 19-24; Plaintiff's Statement of Undisputed Material Facts ¶ 2; Scott Certification (ECF 50-1), Exhibit 2 at County 0508.

Two days later, the supervisory prosecutor's authority was dialed back by his bosses, and the outside lawyers were asked to fold consideration of the Slack message into their still-ongoing investigation.  See Hudson County Statement of Material Facts ¶ 30; Scott Certification, Exhibit 20 at 19:6-16.

The investigation wrapped up in August 2021, and the lawyers put together a report.  See Hudson County Statement of Material Facts ¶ 46; Plaintiff's Hudson County Response (ECF 53-1) ¶ 46.

It was made available to the senior leaders of the county prosecutor's office.  See Hudson County Statement of Material Facts ¶¶ 46, 56; Plaintiff's Hudson County Response ¶¶ 46, 56.

Around a month and a half later, on September 20, the office's senior leaders met "to discuss appropriate disciplinary action for [the supervisory prosecutor] in light of the investigative report."  See Hudson County Statement of Material Facts ¶ 57; Plaintiff's Hudson County Response ¶ 57.

They decided to fire him --- in four days, on September 24.  See Pereira Statement of Material Facts (ECF 49-2) ¶¶ 46-47; Plaintiff's Pereira Response (ECF 57-1) ¶¶ 46-47.

On September 24, the supervisory prosecutor's lawyer sent a letter to the prosecutor's office, complaining about his client's treatment during the investigative and disciplinary process.  See Hudson County Statement of Material Facts ¶ 64; Plaintiff's Hudson County Response ¶ 64; Scott Certification, Exhibit 17 ("Letter"), at 2-3.

---

[3]  After transitioning to remote work during the early days of the COVID-19 pandemic, a group of employees created the group chat.  See Hudson County Statement of Material Facts ¶¶ 19-20; Plaintiff's Hudson County Response (ECF 53-1) ¶¶ 19-20.

About an hour after the letter came in, the supervisory prosecutor was asked to meet at the end of the day with the head of human resources.  See Pereira Statement of Material Facts ¶ 50; Plaintiff's Pereira Response ¶ 50.

At the HR meeting, he was fired.  See Hudson County Statement of Material Facts ¶¶ 56, 58; Plaintiff's Statement of Undisputed Material Facts ¶ 13.

### B. Procedural History

In light of the above, the supervisory prosecutor filed this lawsuit.  He is called "the Plaintiff."

The Plaintiff sued the prosecutor's office,[4] the county,[5] the county prosecutor,[6] and the office's head of human resources.[7] They are collectively called "the Defendants."

The Plaintiff pressed various claims.  These are discussed in more detail as they come up below.[8]

### C. The Motion

The Defendants now move for summary judgment on all counts.  See Hudson County Motion for Summary Judgment (ECF 50-3) at 5-23; Pereira Motion for Summary Judgment (ECF 49-3) at 4-18.

For his part, the Plaintiff has cross-moved for summary judgment on two of his claims.  See Plaintiff's Motion for Summary Judgment (ECF 51-1) at 4-18.

The motions are before the Court.[9]

---

[4]  Recall: the Hudson County Prosecutor's Office.

[5]  Hudson County.

[6]  Esther Suarez.

[7]  Anna Pereira.

[8]  As to the Plaintiff's claims that arise under federal law, see Amended Complaint (ECF 16) ("Complaint") ¶¶ 32-44, the Court has subject matter jurisdiction based on the federal question statute.  See 28 U.S.C. § 1331.  As to the state law claims, the Plaintiff has invoked the Court's supplemental jurisdiction. See 28 U.S.C. § 1367.

[9]  The everyday rules as to summary judgment motions apply here. A motion for summary judgment should be granted if "the movant

D.   **The Court's Approach**

The Court evaluates the parties' motions as follows.

Part II focuses on the Plaintiff's New Jersey Conscientious Employee Protection Act claim (Count I).  As to that claim, the Defendants have moved for summary judgment.  The Court's conclusion: the motion must be granted.

Part III addresses the Plaintiff's First Amendment retaliation claim (Count III), as to which the Defendants have also moved for summary judgment.  The Court's conclusion: that motion must be denied.

Part IV takes up the Plaintiff's due process claims under the United States and New Jersey Constitutions (Count IV).  The parties have cross-moved for summary judgment as to these claims.  The Court concludes that the Defendants' motion must be granted, and therefore denies the Plaintiff's motion.

Part V addresses the Plaintiff's claim for wrongful discharge under New Jersey common law (Count II), as to which the parties have also cross-moved for summary judgment.  The Court concludes that the motions must be granted in part and denied in part.

---

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); see also Dupree v. Younger, 598 U.S. 729, 737 (2023); Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 100 (3d Cir. 2023). "A factual dispute is material if it might affect the outcome of the suit under the governing law." Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Such a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 203-04 (3d Cir. 2022) (cleaned up). And in assessing a summary judgment motion, "a district court may not make credibility determinations or engage in any weighing of the evidence." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004). Rather, the court must "view the facts in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor." Canada, 49 F.4th at 345; accord Tolan v. Cotton, 572 U.S. 650, 660 (2014).

## II.  <u>Conscientious Employee Protection Act</u>

Look first to the Plaintiff's claim under New Jersey's Conscientious Employee Protection Act ("CEPA").  <u>See</u> Complaint ¶¶ 20-24.

To make out a CEPA claim, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

<u>Chiofalo</u> v. <u>State</u>, 238 N.J. 527, 541 (2019).

Here, the Plaintiff's CEPA claim is based solely on the September 24 letter his lawyer sent to the county prosecutor's office.  <u>See</u> Complaint ¶ 21; <u>see</u> <u>generally</u> Part I.A (describing the letter).

The Defendants seek summary judgment as to the CEPA claim for two main reasons.

Take these up just below.

### A.    <u>"Whistle-Blowing"</u>

The Defendants' first argument: the lawyer's letter did not count as "whistle-blowing" activity under CEPA.  <u>See</u> Hudson County Motion for Summary Judgment at 16-18.

This argument works.

To see why, start with the governing law.  To qualify as protected "whistle-blowing" under the section of CEPA the Plaintiff invokes, <u>see</u> Complaint ¶ 21 (citing N.J.S.A. 34:19-3(c)), "the complained of activity must have public ramifications, and . . . the dispute between employer and employee must be more than a private disagreement."  <u>Maw</u> v. <u>Adv. Clinical Comms., Inc.</u>, 179 N.J. 439, 445 (2004).

The lawyer's September 24 letter does not measure up to this standard.

The letter deals only with the Defendants' treatment of the Plaintiff.

It does not suggest that the "complained of activity," id. --- the way the Plaintiff was being investigated and disciplined --- might potentially be something with broader resonance, something "more than a private disagreement." Id.

That is clear from a read-through of the letter.

Around 2/3 of the letter is spent walking through a day-by-day account of the Plaintiff's dealings with prosecutor's office personnel. See Scott Certification, Exhibit 17 at 2-3.

And from there, the letter proceeds as lawyers' letters often do.

It rejects a proposal that the Plaintiff "agree to some type of discipline." See id. at 3.

And it props open the door for further conversation. See id. ("[A]s I told you on the phone, [the Plaintiff] would be more than happy to speak with the [county prosecutor] or [the head of human resources] about this issue.").

The letter is a close-to-the-ground piece of advocacy. It is wholly focused, as might be expected, on the precise contours of the Plaintiff's interactions with his employer.

The letter does not suggest the Defendants' investigation is affecting others. And there is no meaningful invocation of systematic flaws in the prosecutor's office's investigative or disciplinary processes --- the sort of flaws that could have a spillover impact, beyond the Plaintiff.

The letter, in short, does not turn a spotlight on bigger issues. It does not gesture at any "public ramifications." Maw, 179 N.J. at 445. Its focus is zoomed-in all the way --- on the Plaintiff's description of how he, himself, was assertedly treated. See, e.g., Scott Certification, Exhibit 17 at 3.

This is bread-and-butter advocacy in the context of a "private disagreement." Maw, 179 N.J. at 445. It is not the stuff of whistle-blowing under New Jersey law.

And the picture is not changed by the fact that, in one sentence, the September 24 letter invokes the law.  See Scott Certification, Exhibit 17 at 3 ("As you are aware, there are numerous cases that indicate that a public employee cannot be punished on two separate occasions for the same offense.").

The law's protections belong to everyone.  And in that sense, there are "public ramifications," Maw, 179 N.J. at 445, whenever the law is allegedly broken.

But the New Jersey Supreme Court has said that "[a]llowing [a] plaintiff's . . . private dispute with h[is] employer to go forward under CEPA's rubric dilutes the statute's salutary goals."  Id. at 446.

This is a "private dispute," id., about whether one person should lose his job.  It would badly "dilute" CEPA, id., if the statute could be brought to bear in the context of an everyday employment matter like this one, just because a lawyer glancingly refers to the law.

In a nutshell: the September 24 letter does not count as "whistle-blowing" under CEPA.

### B.  <u>Causation</u>

The Defendants' second argument: they are entitled to summary judgment on the Plaintiff's CEPA claim because no "causal connection" ran from (a) the September 24 letter to (b) the decision to fire the Plaintiff; (a) did not cause (b), the argument goes, and causation is a necessary component of a CEPA claim.  See Hudson County Motion for Summary Judgment at 18-19.

This argument is also persuasive.

The relevant undisputed evidence is this:

- On September 20, the county prosecutor met with the head of human resources and others.  During that meeting, the prosecutor decided to fire the Plaintiff.  See Scott Certification, Exhibit 21 at 78:10-15; id., Exhibit 20 at 60:24 to 61:1.
- The group decided not to inform the Plaintiff until September 24, "to create the leas[t] amount of disruption to the office."  Id., Exhibit 20 at 60:11-13; see also id., Exhibit 21 at 80:1-11.

8

- During the afternoon of September 24, an employee of the prosecutor's office received the Plaintiff's lawyer's letter by email.  <u>See</u> Hudson County Statement of Material Facts ¶ 64; Plaintiff's Hudson County Response ¶ 64.
- Around two hours later, the Plaintiff was asked to speak at the end of the day to HR.  <u>See</u> Scott Certification, Exhibit 18 at 143:2-6; Pereira Statement of Material Facts ¶ 50; Plaintiff's Pereira Response ¶ 50.
- And just over an hour later, the Plaintiff was told that he was fired.  <u>See</u> Pereira Statement of Material Facts ¶¶ 50-51; Plaintiff's Pereira Response ¶¶ 50-51.

No reasonable jury[10] could conclude from this that the Plaintiff was fired because of the September 24 letter.

The reason: the undisputed evidence is that the decision to fire the Plaintiff had <u>already</u> been made when the September 24 letter came in, and so had the decision as to when he would be fired.

The lawyer's September 24 letter --- the asserted whistle-blowing --- made no difference.

And it is hard to know how it could have.

Per the undisputed evidence, the county prosecutor (who made the bottom-line decision to fire the Plaintiff, <u>see</u> Hudson County Statement of Material Facts ¶ 65; Plaintiff's Statement of Material Facts ¶ 11) did not learn of the September 24 letter until <u>after</u> the Plaintiff was fired.  <u>See</u> Scott Certification, Exhibit 21 at 86:2-17.

And the governing "legal principle here is common sense --- an employer cannot retaliate based on something it does not know about." <u>Mirena</u> v. <u>Exec. Jet Mgmt., Inc.</u>, 760 F. Supp. 3d 224, 252 (D.N.J. 2024); <u>see</u> also, <u>e.g.</u>, <u>Daniels</u> v. <u>Sch. Dist. of Phila.</u>, 776 F.3d 181, 196 (3d Cir. 2015) ("The plaintiff . . . cannot establish that there was a causal

---

[10]  A "reasonable" jury because on a summary judgment motion "[p]art of a court's job ... is to look ahead to the possibility of trial and ask whether a reasonable jury could find for the [nonmovant]. If yes, a trial must be greenlighted. If no, there is no need for a trial --- and judgment can be entered[.]" <u>Mirena</u> v. <u>Exec. Jet Mgmt., Inc.</u>, 760 F. Supp. 3d 224, 231 (D.N.J. 2024).

connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.") (cleaned up); Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("[F]or protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct."); Martone v. Jet Aviation Flight Servs., 2020 WL 3969919, at *5 (D.N.J. July 13, 2020) ("[A] plaintiff must be able to demonstrate the employer knew the employee engaged in protected activity."); Harris v. Clean Harbors Env't Servs., Inc., 2019 WL 5446299, at *14 (D.N.J. Oct. 24, 2019) ("Plaintiff presents no evidence whatsoever that Defendant . . . even knew about his alleged complaint."); Bowen v. Parking Auth. of City of Camden, 2003 WL 22145814, at *18 (D.N.J. Sept. 18, 2003); Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 109 (2008) (stating that CEPA requires "a sufficient expression" of an employee's disagreement to put the employer on notice).

*    *    *

The Defendants' summary judgment motion as to the Plaintiff's CEPA claim must be granted.

The September 24 letter was not CEPA "whistle-blowing."  See Part II.A.  And even if it had been, the September 24 letter had no role in causing the Plaintiff's firing.  See Part II.B.

## III.  **First Amendment Retaliation**

Turn now to the Plaintiff's First Amendment retaliation claim. See Complaint ¶¶ 32-37.

To make out such a claim, a plaintiff "must show (1) that [he] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

Here, the parties' back-and-forth is focused on the third piece, the "causal connection" element.

The Plaintiff's argument: he was not fired because of his Slack comment about the "Mexican" software platform, see Part I.A, but rather as retaliation --- for earlier Facebook posts he had made, about political/public issues.  See Complaint ¶¶ 32-37;

Opposition to the Hudson County Motion for Summary Judgment (ECF 53) at 3-8.

The Defendants' counterargument: the Plaintiff's Facebook posts did not matter; he was fired entirely based on his Slack comment.  See Hudson County Motion for Summary Judgment at 5; Pereira Motion for Summary Judgment at 13.

\*        \*        \*

In retaliation cases, causation is often a jury question.  See Falco v. Zimmer, 767 F. App'x 288, 310 (3d Cir. 2019); Hill v. City of Scranton, 411 F.3d 118, 127 (3d Cir. 2005) (citing Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004)); Green v. Phila. Hous. Auth., 105 F.3d 882, 889 (3d Cir. 1997).

And that, the Court concludes, is how it should go here --- the Defendants are not entitled to summary judgment.

To begin to see why, recall the basic rules of the road:

In assessing a summary judgment motion, a court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up); accord Tolan v. Cotton, 572 U.S. 650, 660 (2014).

In doing so, a key touchstone is whether a "reasonable jury" could find for the non-moving party, here the Plaintiff.  If yes, the summary judgment motion must be denied.  If no, it must be granted.  See footnote 10; accord, e.g., Dejewski v. Nat'l Beverage Corp., 735 F. Supp. 3d 511, 519-21 (D.N.J. 2024); Adams v. City of Newark, 747 F. Supp. 3d 721, 728, 731 (D.N.J. 2024); Maltez v. N.J. Transit Rail Ops., Inc., 2024 WL 3276998, at *6 (D.N.J. July 1, 2024); Lopez v. Corozal Auto Repair Inc., 732 F. Supp. 3d 383, 388 (D.N.J. 2024).

\*        \*        \*

Come back now to the causal questions raised by the Plaintiff's First Amendment retaliation claim.

To succeed on such a claim, the Plaintiff must show that a "but-for" link ran from protected constitutional activity to a retaliatory act.  See Mirabella v. Villard, 853 F.3d 641, 651-52 (3d Cir. 2017).  Here, that means a tie from the Plaintiff's Facebook posts to the decision to fire him.

A causal showing can be based on "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." DeFlaminis, 480 F.3d at 267.  Or it can be inferred from "other evidence gleaned from the record as a whole." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000).

And a retaliation claim can be defeated if a defendant "show[s] that it would have taken the same action even if the plaintiff had not engaged in the protected activity." DeFlaminis, 480 F.3d at 267; Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002); see also Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

                         *    *    *

Here, there is meaningful evidence that the Plaintiff was fired only because of his Slack comment.[11]

If this is the right view of the evidence, then the Plaintiff's Facebook posts were irrelevant.  They made no difference --- and the Plaintiff therefore cannot succeed on his claim that he was fired because of those Facebook posts, in violation of the First Amendment.

To see the causation evidence from this perspective --- and it is not the only one --- first step back for a moment.

As a general matter, causation can be slippery and therefore difficult to analyze in a structured way.  This said, one way to get a firm handhold on whether (a) caused (b) is to ask three questions.  See Mirena, 760 F. Supp. 3d at 234-35.

First, was (a) the kind of thing that causes (b)?  See id.

Second, was (a) severe enough to cause (b)?  See id.

---

[11]  Recall: the Plaintiff's comment was that a software program "identifies as Mexican.  It sleeps when the sun is hottest." See Hudson County Statement of Material Facts ¶¶ 19-24; Plaintiff's Statement of Undisputed Material Facts ¶ 2; Scott Certification (ECF 50-1), Exhibit 2 at County 0508.

And third, how close in time were (a) and (b)?  A small gap in time suggests causation, a long gap angles things the other way.  See id.

Here, as will be seen in a moment, the answer to each of these three questions seems --- at first at least --- to tilt the scale in the Defendants' direction.

* * *

First, as to the qualitative component.

Making a comment that is taken as racist --- as the Plaintiff's Slack comment "certainly" was, Scott Certification (ECF 50-1), Exhibit 20 at 41:3-4 --- is the kind of thing that can cause the person who made the comment to be fired.  See, e.g., Rivera v. Nemours Found., 2023 WL 5038257, at *5 (D. Del. Aug. 8, 2023); Natale v. East Coast Salon Servs., Inc., 2014 WL 4854442, at *4 (D.N.J. Sept. 30, 2014); Dushane v. Leeds Hose Co. #1 Inc., 6 F. Supp. 3d 204, 213 n.6 (N.D.N.Y. 2014); Baur v. Rosenberg, Minc, Falkoff & Wolff, 2008 WL 5110976, at *4-*5 (S.D.N.Y. Dec. 2, 2008); Brooks v. USX Corp., 2006 WL 2547342, at *6 (W.D. Pa. Aug. 31, 2006); Chapkines v. N.Y. Univ. Sch. of Continuing & Pro. Stud., 2005 WL 167603, at *8 (S.D.N.Y. Jan. 25, 2005).

This makes it more likely that the Slack comment was, in fact, the cause of the Plaintiff's firing.

* * *

Second, as to the quantitative component.

A given infraction can be more or less severe.  The more severe the infraction, the more likely that it was in fact the cause of a particular discipline-related outcome.  See Mirena, 760 F. Supp. 3d at 235.

The Plaintiff's Slack comment was regarded as especially severe.

Another prosecutor who was in the group chat found the comment "racist and discriminatory."  Scott Certification, Exhibit 2 at County 0474.  She was "visibly upset" when she reported it to her supervisor.  See id., Exhibit 3 at County 0028.[12]

_____

[12]  And note: when an employee acts in a way that hurts workplace morale --- that is sometimes viewed as a basis for discipline.  See, e.g., Zuniga v. Gowan Milling Co., 2023 WL 6248700, at *8 (D. Ariz. Sep. 26, 2023); Mueller v. Car Wash Partners Inc.,

And furthermore: the company that provided the software platform that the Plaintiff's comment was aimed at emailed the county prosecutor to say he was "disturbed" to learn about the "racist 'joke.'"  <u>See</u> Scott Certification, Exhibit 11 at County 0055. The vendor expressed concern that it might harm the company's reputation.  <u>See</u> <u>id</u>.  And he "request[ed] an immediate investigation," and said that, if the Plaintiff was found responsible, he "be held accountable."  <u>Id</u>.[13]

Finally, multiple media outlets covered the Plaintiff's Slack comment.  One article called it a "racist joke."  <u>See</u> Scott Certification, Exhibit 6 at 1.  Other outlets reached out to the prosecutor's office for comment.  <u>See</u> <u>id</u>., Exhibit 7 to Exhibit 10.[14]

Bottom line: the Plaintiff's Slack comment was viewed as a severe infraction --- and that reinforces the idea that it was the Slack comment that was the cause of his termination.

*    *    *

<u>Third</u> and finally, the <u>timing</u> of an event "can shed light on causation."  <u>Mirena</u>, 760 F. Supp. 3d at 235; <u>see</u> <u>also</u> <u>DeFlaminis</u>, 480 F.3d at 267.  A short time gap between an action

---

2021 WL 4247928, at *5 (D. Ariz. Sep. 17, 2021); <u>Hicks-Washington</u> v. <u>Hous. Auth. of City of Fort Lauderdale</u>, 2019 WL 11690158, at *7 (S.D. Fla. May 6, 2019); <u>Algie</u> v. <u>Northern Ky. Univ.</u>, 2010 WL 55928, at *15 (E.D. Ky. Jan. 4, 2010); <u>Swider</u> v. <u>Ha-Lo Indus., Inc.</u>, 134 F. Supp. 2d 607, 627 (D.N.J. 2001).

[13]  And note: harming business relationships and drawing complaints from relevant third parties --- that is sometimes taken as a reason for disciplinary action.  <u>See</u>, <u>e.g.</u>, <u>Joseph</u> v. <u>Owens & Minor Distrib., Inc.</u>, 549 F. App'x 29, 30 (2d Cir. 2015); <u>Crocker</u> v. <u>City of Cleveland</u>, 39 F. App'x 248, 250 (6th Cir. 2002); <u>Resnick</u> v. <u>Sebelius</u>, 2014 WL 11497800, at *5 (D. Ariz. Jan. 30, 2014); <u>Sabin</u> v. <u>Amrep Inc.</u>, 2007 WL 4459149, at *14 (D. Colo. Dec. 14, 2007); <u>Haggard</u> v. <u>Standard Register Co.</u>, 2003 WL 22102133, at *9 (D. Kan. Aug. 1, 2003).

[14]  Performance that leads to negative media attention --- that, too, is an often-recurring factor in decisions to discipline an employee.  <u>See</u>, <u>e.g.</u>, <u>Burlington</u> v. <u>News Corp.</u>, 2016 WL 1221426, at *6 (E.D. Pa. Mar. 29, 2016); <u>Palacios</u> v. <u>City of Crystal</u>, 2013 WL 12177177, at *13-15 (W.D. Tex. Sep. 30, 2013).

(like the comment) and a consequence (like being fired) makes a causal relationship more likely.

About six and a half months passed between the day the Plaintiff sent the Slack comment and the day he was fired. See Hudson County Statement of Material Facts ¶¶ 22-24, 68; Plaintiff's Hudson County Response ¶¶ 22-24, 68.

That might look like the sort of "too-long" gap, Mirena, 760 F. Supp. 3d at 240, that whittles away at the suggestion of causation. See, e.g., Claiborne v. Se. Pa. Transp. Auth., 2022 WL 4180977, at *3 (3d Cir. Sept. 13, 2022); Wilcox v. Martinez, 858 F. App'x 477, 479-80 (3d Cir. 2021); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007); Savage v. Autolender's Liquidation Ctr., Inc., 2025 WL 559706, at *4 (D.N.J. Feb. 20, 2025); Mims v. New Age Prot., Inc., 2018 WL 5829339, at *4 (E.D. Pa. Nov. 6, 2018); Meky v. Jetson Specialty Mktg. Servs., Inc., 2017 WL 878235, at *4 (E.D. Pa. Mar. 6, 2017); Carswell v. UPMC/UPMC Braddock Hosp., 2014 WL 1050449, at *9 (W.D. Pa. Feb. 11, 2014); Walker v. Indep. Blue Cross, 2005 WL 1266590, at *7 (E.D. Pa. May 27, 2005).

But not here.

The Plaintiff was asked to report to a meeting two days after he made the Slack comment. See Scott Certification, Exhibit 2 at County 0474. At that meeting, he was suspended from his supervisory position. See id., Exhibit 20 at 18:2 to 19:16.

A gap in time that small is strongly suggestive of causal effect. See Mirena, 760 F. Supp. 3d at 241 (collecting cases).

And the remaining time --- between March 12, when the Plaintiff was suspended, and September 24, when he was fired --- "was not dead time." Id. It was used, and actively. To investigate, and then to decide how to proceed.

The undisputed facts make that clear.

On March 12, the outside lawyers were asked to incorporate the Slack comment into their then-ongoing investigation. See Hudson County Statement of Material Facts ¶ 30; Plaintiff's Hudson County Response ¶ 30.

That investigation, as noted, spun off a wide-ranging report about the county prosecutor's office, which was delivered on August 2.  See Scott Certification, Exhibit 2 at County 0462.[15]

The county prosecutor reviewed the report herself "sometime" that month.  See id., Exhibit 21 at 70:23-25.

And on September 20, after consulting with members of her team, she determined that the Plaintiff should be fired.  See id. at 79:19 to 80:3.

Four days later, the Plaintiff was informed of that decision. See Pereira Statement of Material Facts ¶¶ 50-51; Plaintiff's Pereira Response ¶¶ 50-51.

On balance, the timing here seems to push in the direction of the conclusion that it was the Plaintiff's Slack comment, see footnote 15, that caused him to be fired.

Among other things, he was suspended just after the comment was made.  And while many months passed from suspension to termination, that gap was not too long as a practical matter; the investigation was broad, and it took a while to wrap up.

\*    \*    \*

In short: there is real evidence that the Plaintiff was fired solely because of the Slack comment.[16]

\*    \*    \*

But while on one view of the evidence, the one set out just above, the needle moves in the Defendants' direction --- it does not move far enough for them to win here on their summary judgment motion.

This is because there is another way to see the evidence, and "the evidentiary sifting (why was the Plaintiff fired?) is not to be taken away from the jury," Dejewski, 735 F. Supp. 3d at 524, by the Court's granting of a summary judgment motion.

_____

[15]  That it took some time to prepare the report makes sense. The report addressed a range of issues and was based on interviews with eight employees.  See id.

[16]  Indeed, senior decisionmakers said as much at their depositions.  See Scott Certification, Exhibit 20 at 66:18-21; id., Exhibit 21 at 77:8-15.

The Plaintiff is the non-movant, and the Defendants are therefore entitled to summary judgment only if no reasonable jury could find for the Plaintiff.  See SodexoMAGIC, 24 F.4th at 203-04.

And a reasonable jury's could opt to run the clock back a bit --- to focus first not on the evidence of the Plaintiff's Slack comment, but on what happened before that, on the response to his first relevant Facebook post.

Recall that "the purpose" of the outside lawyers' initial sit-down with the Plaintiff, on October 6, 2020, was to ask him about a Wall Street Journal opinion piece he had apparently circulated via his Facebook account.  See Scott Certification, Exhibit 2 at County 0472.  The WSJ piece concerned matters of public interest.  See id. at County 0472, 0499.

And over the next five or so months, other materials that the Plaintiff circulated through Facebook were forwarded to the outside lawyers, too.  See id. at County 0467-68.  These, too, concerned public affairs.  See id. (outside lawyers' report, quoting a September 1, 2020 Facebook post from the Plaintiff that said, among other things: "'We're from New Jersey, don't judge us by out governor' is a great way to break the ice and get a laugh [in Maine].")

Meanwhile, on March 12, the outside lawyers were asked to add something new into their then-ongoing review --- consideration of the Slack comment the Plaintiff had made a couple of days earlier.  See id. at County 0468.  The Plaintiff was then interviewed again by the outside lawyers.  See id.

Based on all of this, the outside law firm prepared a report that was plainly thorough and careful.

And the key prosecutor's office decision-makers testified that they did what might have been expected.  They waited for the report.  See id., Exhibit 20 at 38:21-25; id., Exhibit 21 at 58:4-24.  And they leaned on its findings in deciding how to proceed.  See id., Exhibit 21 at 74:3-12; see also Hudson County Statement of Material Facts ¶ 57; Plaintiff's Hudson County Response ¶ 57.

That, to a reasonable jury, might well make the report's conclusion as to the Plaintiff especially telling.  That conclusion:

> The evidence presented was sufficient . . . to sustain a finding that certain [Facebook] . . . postings by [the Plaintiff's] and his comment on Slack were inappropriate and/or in violation of County policy.  When taken alone, each would likely be insufficient to create a hostile work environment.  The cumulative effect of the posts and comments, however, if permitted to continue, could form the basis of pervasive conduct sufficient to create a hostile work environment.  As such, we recommend appropriate action be taken in this regard to ensure that such conduct does not continue.

Id., Exhibit 2 at County 0490.

This can be read in a variety of ways.

But the Plaintiff, as the non-movant, is entitled to the "most favorable" reasonable reading from the perspective of his position.  Canada, 49 F.4th at 345 (cleaned up).

And that reading would emphasize that, per the outside lawyers, "action . . . should be taken" not because of the Plaintiff's Slack comment alone --- but because of the "cumulative effect" of the Plaintiff's Slack comment and the Plaintiff's Facebook posts.  Scott Certification, Exhibit 2 at County 0490 (emphasis added).

If the outside lawyers recommended "action" based in part on the Plaintiff's Facebook posts (the evidence is they did), and if the Plaintiff was fired based in part on the outside lawyers' recommendation (the evidence is he was) --- then a reasonable juror could determine that the Facebook posts were a meaningful part of why he was fired.

Put differently, a reasonable juror could conclude that, "but-for" the Facebook posts, "action" to fire the Plaintiff would not have been taken.  Indeed, the outside lawyers' advice specifically invoked and rested on the Facebook posts, and the posts' place in the "cumulative" body of evidence.[17]

---

[17]  Sometimes, in can be determined as a matter of law that an event at Time 1 did not cause an impact at Time 3 because an

And a read of the evidence along the above lines could make for
a winning First Amendment retaliation claim for the Plaintiff.
See generally Mirabella, 853 F.3d at 651-52 (to succeed on a
First Amendment retaliation claim, a plaintiff must show a "but-
for" link between protected constitutional activity and a
retaliatory act).[18]

_____

intervening event at Time 2 did the causal work.  See, e.g.,
Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 330 (3d Cir. 2016).
But that approach does not work here.  The reason: giving the
non-moving Plaintiff the inferences he is entitled to, see
Canada, 49 F.4th at 345, means noting that the outside lawyers'
report bundled together the Time 1 Facebook posts with the Time
2 Slack comment --- concluding that they, on a "cumulative"
basis, supported the recommendation that "action" should be
taken.  In turn, that recommendation, a reasonable jury could
conclude, was one of the core premises of the Time 3 decision to
fire the Plaintiff.  In short: what happened at Time 1 cannot be
hived off as a matter of law from what happened at Time 2 ---
because the outside lawyers' report treated each of the two as
necessary pieces, that together tipped the scales to a
recommendation of Time 3 "action."  See generally Mirena, 760 F.
Supp. 3d at 244 ("if the Time 1 and Time 2 events blend together
in some way . . . teasing apart their impact can sometimes be
tricky[,]" and "[t]hat can make it especially hard to say
whether the intervening [Time 2] event mattered on its own ---
or mattered only because it piggy-backed on the earlier [Time 1]
event").

[18]  In their reply brief, the Defendants contend for the first
time that the Plaintiff's Facebook posts were not protected by
the First Amendment.  See Reply Brief in Further Support of
Hudson County Motion for Summary Judgment (ECF 56) at 2-8.
Therefore, the argument goes, retaliation based on the posts
cannot be chalked up as First Amendment retaliation.  But courts
routinely decline to consider arguments raised for the first
time in a reply brief.  See Stevenson v. City of Newark, 2025 WL
1793756, at *5 (D.N.J. June 30, 2025); Milan v. N.J. Transit
Rail Operations, Inc., 2025 WL 842313, at *4 n.4 (D.N.J. Mar.
18, 2025); Ouaziz v. Murphy, 2024 WL 397708, at *4 n.5 (D.N.J.
Feb. 2, 2024); Theodore v. Newark Dep't of Health & Cmty.
Wellness, 2020 WL 4349900, at *2 (D.N.J. July 29, 2020); Atain
Specialty Ins. Co. v. Ne. Mountain Guiding, LLC, 2020 WL 487110,
at *5 n.5 (D.N.J. Jan. 30, 2020); Tormasi v. Lanigan, 363 F.
Supp. 3d 525, 540 n.7 (D.N.J. 2019); Ind. Lab'y Emps. Union,
Inc. v. ExxonMobil Rsch. & Eng'g Co., 2019 WL 3416897, at *8
(D.N.J. July 29, 2019); Cooper v. Medimetriks Pharms., Inc.,

Is this the best read of the evidence?  Maybe, maybe not.

But a reasonable jury could land on the conclusion set out here. And that means the Plaintiff's First Amendment retaliation claim is for a jury to consider --- not for the Court to take away, by granting summary judgment.  See Mirena, 760 F. Supp. 3d at 231; Dejewski, 735 F. Supp. 3d at 519-21; Adams, 747 F. Supp. 3d at 728, 731; Maltez, 2024 WL 3276998, at *6; Lopez, 732 F. Supp. 3d at 388.

The Defendants' motion for summary judgment as to the First Amendment retaliation claim is denied.

## IV.  **Due Process**

Turn now to the Plaintiff's claim under the Due Process Clause of the federal Constitution.  This is at Count IV of the Complaint.[19]  See Complaint ¶¶ 38-44.

As to such a claim, "[t]he first step . . . is to determine whether the asserted individual interest is encompassed within the Fourteenth Amendment's protection of life, liberty, or property."  Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir. 2005) (cleaned up).

---

2019 WL 1370414, at *5 (D.N.J. Mar. 25, 2019); Huertas v. Citigroup, Inc., 2015 WL 2226012, at *4 (D.N.J. May 11, 2015); Marrin v. Capital Health Sys., Inc., 2015 WL 404783, at *8 n.12 (D.N.J. Jan. 29, 2015); Jurista v. Amerinox Processing, Inc., 492 B.R. 707, 779 (D.N.J. 2013); Thomas v. Correctional Med. Servs., Inc., 2009 WL 737105, at *13 (D.N.J. Mar. 17, 2009); Citizens for a Better Lawnside, Inc. v. Bryant, 2007 WL 4547496, at *8 (D.N.J. Dec. 18, 2007); Kedia v. Jamal, 2007 WL 1147059, at *2 (D.N.J. Apr. 18, 2007); Advanced Restoration Techs., Inc. v. Shortages, Inc., 2006 WL 827841, at *1 n.2 (D.N.J. Mar. 30, 2006); Capodici v. City of Jersey City, 2005 WL 2452698, at *7 n.5 (D.N.J. Sep. 30, 2005).  And all the more so here.  The question of whether the Facebook posts were First Amendment-protected was hardly obscure.  That question is necessarily at the heart of the Plaintiff's First Amendment retaliation claim, which has been a part of this case from the get-go.

[19]  The Plaintiff also presses a mirror-image due process claim, under the New Jersey Constitution.  The New Jersey claim is also a part of Count IV.  See Complaint ¶¶ 38-44.  Work through that claim below, in Part IV.C.

What "interest" is said to be on the table here?  Consider that just below.

### A.    Employment

First, the Plaintiff seems[20] to invoke an "interest" in his continued employment with the county prosecutor's office.  See Complaint ¶ 41.

But the Plaintiff "was an at-will employee."  Hudson County Statement of Material Facts ¶ 11; Plaintiff's Hudson County Response ¶ 11.  He could therefore be fired without cause.  See Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 397 (1994).

And that means that the Plaintiff's federal due process claim cannot get off the ground on a deprivation-of-employment theory.

> To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment.  The decisional law is clear that an at-will employee does not have a legitimate entitlement to continued employment because she serves solely at the pleasure of her employer.  Therefore, once a court determines that a public employee held her position at the will and pleasure of the governmental entity, such a finding necessarily establishes that the employee had no property interest in the job sufficient to trigger due process concerns.

Elmore, 399 F.3d at 282 (cleaned up).

### B.    Reputation

The Plaintiff's second asserted interest: "a protected liberty interest in his reputation."  Complaint ¶ 40; see also Opposition to the Hudson County Motion for Summary Judgment at 11.

---

[20]  "Seems" because the argument is not meaningfully developed.

This contention is based on some undisputed evidence that has not yet been discussed.

Namely:

On March 21, 2021, a New Jersey website published a story headlined "SOURCES: [Prosecutor's office] probed for racist, hostile work environment under [the county prosecutor]."  Scott Certification, Exhibit 6 at 1.

The article included a screenshot of the Slack comment sent by the Plaintiff, see id. at 2, plus Facebook posts from the Plaintiff and some of his then-colleagues.  See id. at 2, 5-7.

The next day the prosecutor's office distributed a statement to the press.  See id., Exhibit 8; see also Plaintiff's Statement of Material Facts ¶¶ 4-6; Hudson County Response (ECF 54) ¶¶ 4-6.

The Plaintiff alleges the press release hurt his reputation and limits his ability to get other jobs.  See Complaint ¶ 40, 42.

To evaluate this claim, start with the legal components of a reputation-based federal due process claim.

                    *    *    *

As a matter of federal due process law, individuals have a liberty interest in their reputation.  See Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).

But "reputation alone is not an interest protected by the Due Process Clause."  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1371 (3d Cir. 1993) (emphasis added).

"Rather, to make out a [federal] due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest."  Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006) (emphasis in original).

The remedy for a winning "stigma plus" reputational harm claim is a name-clearing hearing.  See Otto v. Williams, 704 F. App'x 50, 53 (3d Cir. 2017) (quoting Ersek v. Twp. of Springfield, 102 F.3d 79, 84 (3d Cir. 1996)).

Focus on the "stigma" part of the equation.

What counts as "stigma[tizing]" for these purposes?  A statement about the plaintiff that was (1) publicly made and (2) false.

See Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006).

The first box is checked here.

The complained-of press release was about the Plaintiff, and it was issued to various media outlets.  See Plaintiff's Statement of Material Facts ¶ 5; Hudson County Response ¶ 5; Pereira Response (ECF 55-1) ¶ 5.

That clears the publicly-made bar.  See, e.g., Chabal v. Reagan, 841 F.2d 1216, 1223 (3d Cir. 1988) (explaining that a statement must be "'published' or otherwise disseminated by [a plaintiff's] government employer to the public"); Slakis v. Cnty. of Luzerne, 2008 WL 4287350, at *5 (M.D. Pa. Sept. 17, 2008) (a statement by an employer that was published in a newspaper article was "public" "because it was disseminated to the [local] community"); compare Bishop v. Wood, 426 U.S. 341, 348 (1976) (a statement that was orally communicated to the plaintiff in private did not pass muster); Anderson v. City of Phila., 845 F.2d 1216, 1222 (3d Cir. 1988) (same, as to test results that were kept "confidential and undisclosed").

The question, then, is whether the second box is also checked -- - whether the press release counts as a false statement.  See generally Hill, 455 F.3d at 236.

The press release in relevant part:

> These are offensive and sickening comments that have no place in our society or the workplace.  As soon as these reprehensible comments were brought to our attention we immediately forwarded the complaint to County Counsel for investigation and discipline as is protocol. . . . [The Plaintiff] has been stripped of any supervisory or prosecutorial authority pending the outcome of the investigation. . . .  We take these comments very seriously and will always investigate and discipline to the full extent.

Scott Certification, Exhibit 8.

What is false about this?

Not that supervisory authority was taken from the Plaintiff.  It was.  See Hudson County Statement of Material Facts ¶ 31; Plaintiff's Hudson County Response ¶ 31; Scott Certification, Exhibit 21 at 13:16-25.

23

And not that an investigation was underway.  <u>See</u> Scott Certification, Exhibit 2 at County 0462.  Again, it was.

The press release described when the investigation started (soon after leadership became aware of the Slack comment) and how it got off the ground (with a complaint passed along to the county's lawyer).  But the parties agree that all of that is true.  <u>See</u> Hudson County Statement of Material Facts ¶¶ 30-31; Plaintiff's Hudson County Response ¶¶ 30-31.

And the parties agree that the Slack comment arguably attributed by the press release to the Plaintiff was in fact made by him. <u>See</u> Hudson County Statement of Material Facts ¶ 24; Plaintiff's Hudson County Response ¶ 24.

What then is left behind that might be false?

The Plaintiff's argument seems to be that it was false to characterize what he said as "racially offensive."  Opposition to the Hudson County Motion for Summary Judgment at 15.

But the Defendants argue back that the release's characterization of the Plaintiff's comment as "offensive" and "sickening" is an opinion --- and an opinion cannot generally be the basis for a due process reputational-harm claim.  Hudson County Motion for Summary Judgment at 10; <u>see</u> <u>also</u> Pereira Motion for Summary Judgment at 16.

The Court's conclusion: the Defendants have it right.

                    *    *    *

To decide whether a person has been stigmatized by a particular statement for federal due process/reputational harm purposes, federal courts are guided by the defamation law of the relevant state --- here, New Jersey.  <u>See</u> <u>Cooley</u> v. <u>Pa. Hous. Fin. Agency</u>, 830 F.2d 469, 473 (3d Cir. 1987), <u>abrogated on other grounds by</u> <u>Foster</u> v. <u>Chesapeake Ins. Co.</u>, 933 F.2d 1207 (3d Cir. 1991); <u>see</u> <u>also</u> <u>Kane</u> v. <u>Chester Cnty.</u>, 811 F. App'x 65, 69 n.3 (3d Cir. 2020); <u>Pasqua</u> v. <u>Cnty. of Hunterdon</u>, 721 F. App'x 215, 219-20 (3d Cir. 2018).

Under New Jersey law, a statement can be defamatory only if it "can be proved true or false."  <u>Lynch</u> v. <u>N.J. Educ. Ass'n</u>, 161 N.J. 152, 167 (1999).

And per the New Jersey Supreme Court, "[s]tatements of opinion . . . generally cannot be proved true or false."  <u>Id</u>.

Therefore, expressing an opinion cannot be the basis for a New Jersey defamation claim.[21]  See id.; see also Ward v. Zelikovsky, 136 N.J. 516, 531 (1994); Kotlikoff v. Cmty. News, 89 N.J. 62, 69 (1982); Lutz v. Royal Ins. Co. of Am., 245 N.J. Super. 480, 494 (App. Div. 1991).

What counts as an opinion for these purposes?

One example: under New Jersey law, saying that someone is "'dishonest and lacking in integrity' is an opinion," because it "is generally not subject to verification."  NuWave Inv. Corp. v. Hyman Beck & Co., 432 N.J. Super. 539, 553 (App. Div. 2013).

Another example: under New Jersey law, a statement accusing someone of bias is an opinion --- that therefore cannot be the stepping-off point for a defamation claim.  See, e.g., Ward, 136 N.J. at 523-24, 542 (publicly stating that the plaintiffs "hate Jews" was not actionable as defamation); Gomez Noriega v. City of Jersey City, 2025 WL 1104016, at *11 n.9 (D.N.J. Apr. 14,

---

[21]  This was not always the law.  There was a time when an opinion could count as defamation.  See 3 Restatement (Second) of Torts § 566 cmt. a (Am. Law. Inst. 1977); Kotlikoff v. Cmty. News, 89 N.J. 62, 68 (1982) ("Traditionally, one could be found liable for defamation if one published an opinion that harmed another's reputation.").  But, as noted, that is not New Jersey law today.  See Lynch, 161 N.J. at 167.  And in looking to state law for "guid[ance]," Kane, 811 F. App'x at 69 n.3, the Third Circuit has zeroed-in on contemporary understandings of state defamation law, not the understandings that prevailed when the relevant constitutional amendments were passed.  See id. at 69-70; Cooley, 933 F.2d at 474; Pasqua, 721 F. App'x at 219-20. (Note that at least in some circumstances, the old rule, that opinion statements can potentially amount to defamation, "now appears to have been rendered unconstitutional by [United States] Supreme Court decisions."  3 Restatement (Second) of Torts § 566 cmt. c (Am. Law. Inst. 1977); see Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974) (stating in dicta that "[u]nder the First Amendment there is no such thing as a false idea," so that "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas"); but cf. Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-20 (1990) (indicating that Gertz did not "create a wholesale defamation exemption for anything that might be labeled 'opinion'").

2025) ("a generalized accusation of racism or bigotry is not sufficiently factual --- that is, subject to proof or disproof --- to support a claim for . . . defamation"); <u>Jorjani</u> v. <u>N.J. Inst. of Tech.</u>, 2019 WL 1125594, at *7 (D.N.J. Mar. 12, 2019) ("[C]alling someone a racist, hater, or bigot --- without more --- will not result in defamation liability."); <u>Edelman</u> v. <u>Croonquist</u>, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010) ("The defendant's characterizations of her in-laws as racist is a subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation."); <u>Bender</u> v. <u>Smith Barney, Harris Upham & Co.</u>, 901 F. Supp. 863, 871 (D.N.J. 1994) ("In New Jersey, a generalized accusation of bigotry is not actionable."); <u>see also</u> <u>Wilson</u> v. <u>Grant</u>, 297 N.J. Super. 128, 136-37 (App. Div. 1996) (taken as a whole, the phrase "wife-beating skunk" was not verifiable for the purposes of a defamation claim); David Elder, Defamation: A Lawyer's Guide § 8:31 (2024) ("Generalized statements specifically imputing racism or bigotry are generally subsumed under the opinion rule as non-actionable.").[22]

*    *    *

With this background in mind, come back now to this case.

---

[22] There are exceptions to the general rule. Most importantly, "[h]arm from a defamatory opinion statement is redressable when the statement implies underlying objective facts that are false." <u>Ward</u>, 136 N.J. at 531; <u>Lynch</u>, 161 N.J. at 167-68; <u>Kotlikoff</u>, 89 N.J. 69-70. For example, saying that certain construction materials were "not engineeringly proper," and "would not meet [a project's] requirements" --- these are opinions. <u>Engineered Framing Sols., Inc.</u> v. <u>Vescom Structures, Inc.</u>, 2005 WL 8174974, at *3 (D.N.J. July 19, 2005). But they can be actionable in a defamation suit because they rest on an implied factual assertion, that the products were "inferior due to some undisclosed standard." <u>Id</u>. But this does not matter here. The press release's assertion that the Slack comment was "offensive and sickening" implies one factual assertion (that the comment was indeed made), and perhaps also another (that it made by the Plaintiff). Scott Certification, Exhibit 8. But no one doubts the factual accuracy of any of that. <u>See</u> Hudson County Statement of Material Facts ¶ 24; Plaintiff's Hudson County Response ¶ 24.

Recall that the New Jersey website that wrote about the relevant events included a screenshot of the Plaintiff's Slack comment about a software platform "identif[ying]" as "Mexican."  <u>See</u> Scott Certification, Exhibit 6 at 2.

And recall that the next-day press release from the prosecutor's office criticized "offensive and sickening" comments.  <u>Id.</u>, Exhibit 8.

This makes it plain: the press release's "offensive and sickening" assertion added up to an assertion that the Plaintiff's day-before "Mexican" statement was bigoted and beyond the pale.  <u>Id</u>

But as shown just above, an "accusation of bigotry," <u>Bender</u>, 901 F. Supp. at 871, does not count as false for New Jersey defamation law.[23]

And because the "offensive and sickening" statement in the press release would not count as false under New Jersey defamation law, it <u>also</u> does not count as false under federal due process law, for the purpose of the reputational harm claim the Plaintiff presses here.  <u>See</u> <u>Kane</u>, 811 F. App'x at 69-70 & n.3; <u>Cooley</u>, 933 F.2d at 473.

###    C.    <u>The State Claim</u>

Where things stand.

To the extent the Plaintiff's federal due process claim rests on employment loss, the Defendants are entitled to summary judgment --- because the Plaintiff was an at-will employee.  <u>See</u> Part IV.A.

And to the extent the Plaintiff's federal due process claim rests on reputational harm, the Defendants are also entitled to summary judgment --- because the press release statements that assertedly hurt his reputation are non-actionable opinions.  <u>See</u> Part IV.B.

*    *    *

---

[23]  And neither do other assertions that a person's conduct does not generally meet moral standards.  <u>See</u> <u>NuWave Inv. Corp.</u>, 432 N.J. Super. at 553 (as to honesty and integrity).

In addition to his federal due process claim, the Plaintiff also presses a mirror-image New Jersey due process claim.  See Complaint ¶¶ 38-44.[24]

But there is no reason to think the state law version of his due process claim should be resolved differently than the federal version.

Look first to the Plaintiff's loss-of-employment due process theory.  See Part IV.A.

Under New Jersey law, as under federal law, "an employee hired at will," as was the Plaintiff here, see id., has "no protected interest in his employment and may not prevail on a claim that his or her discharge constituted a violation of [due process] property rights."  Morgan v. Union Cnty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 355 (App. Div. 1993).

Pivot now to the state-law variant on the reputational-harm due process theory.

The New Jersey Constitution, like the federal Constitution, recognizes an "interest" in one's reputation.  See Doe v. Poritz, 142 N.J. 1, 104 (1995).

And although reputational claims under the federal and N.J. constitutions are distinct, they differ "only as to whether there can be a protectible interest in reputation without requiring any other tangible loss."  Id. (emphasis added).

That is, while federal constitutional reputational claims require "stigma-plus," Hill, 455 F.3d at 236 (emphasis added), when it comes to analogous claims under the New Jersey Constitution, "stigma" alone can be enough.

But that federal/state difference does not matter here.

As noted above, see Part IV.B, the Plaintiff's federal due process reputational-harm claim fails under the "stigma" part of

---

[24] "[T]he [New Jersey] Constitution does not enumerate the right to due process[.]"  State v. Robinson, 229 N.J. 44, 75 (2017) (cleaned up).  But "Article 1, Paragraph 1 protects values like those encompassed by the principle of due process."  Id.  And, like its federal counterpart, "[t]o examine [such] a . . . claim, courts first assess whether a liberty or property interest has been interfered with by the State[.]"  Id.

the test --- because there is no false statement here, only a non-actionable opinion statement.

And so the Plaintiff's state law reputational-harm claim fails, too, and for the same reason --- because there is no actionable stigma.

The "only," Doe, 142 N.J. at 104, difference between federal and state law in this area is about a different corner of the doctrine, about whether a "plus" is required --- not as to what counts as "stigma."

                    *       *       *

In short:

The Defendants are entitled to summary judgment as to both the federal and state aspects of the Plaintiff's Count IV due process claim.

The Plaintiff's summary judgment motion as to the Count IV claim must therefore be denied.

## V.    **Wrongful Discharge**

What remains unaddressed is the Plaintiff's wrongful discharge claim.  See Complaint ¶¶ 25-31.

The Plaintiff's main wrongful discharge theory is that he was denied a name-clearing hearing, as due process assertedly required.  See Plaintiff's Motion for Summary Judgment at 17-18; Plaintiff's Brief in Opposition to the Hudson County Motion for Summary Judgment at 31-32; Plaintiff's Brief in Opposition to the Pereira Motion for Summary Judgment at 9-11.

But that theory is foreclosed by the Court's ruling that the Plaintiff cannot make out a federal or state due process claim, and therefore was not entitled to a name-clearing hearing.  See Part IV.

Therefore, to the extent the Plaintiff's wrongful discharge claim rests on a due process theory, the Defendants' motion for summary judgment must be granted.

                    *       *       *

This said, in his Complaint, the Plaintiff alludes to another basis for his wrongful discharge claim --- namely, that he was

29

disciplined twice for the same behavior in violation of state public policy.  See Complaint ¶¶ 26-28.

Such a claim necessarily requires complex judgments about New Jersey law.

For example, one legal brief here advances its key point by inference --- based on an analogy to an intermediate state appellate case.  See Hudson County Motion for Summary Judgment at 21 (citing Hampton v. Armand Corp., 364 N.J. Super. 194 (App. Div. 2003)).

And the same brief focuses explicitly on policy concerns --- including who is covered by New Jersey civil service laws and the asserted dangers of potentially opening up a route that would skirt around them.  See id. at 21-22.

These are novel and policy-laden arguments.  And they focus on the internal functioning of New Jersey local government as a matter of New Jersey law.

These arguments about New Jersey law and government should be taken up by New Jersey courts, not this one.  Cf. Pinkston v. City of Jersey City, 699 F. Supp. 3d 298, 305 (D.N.J. 2023); Walsifer v. Borough of Belmar, 2006 WL 2990364, at *16 (D.N.J. Oct. 18, 2006) ("Because important considerations of municipal governance and law are involved, it is particularly appropriate that this aspect of the case be decided by state courts."), aff'd, 262 F. App'x 421 (3d Cir. 2008).

Therefore, to the extent the Plaintiff's wrongful discharge claim rests on arguments about double discipline or progressive discipline, see Complaint ¶¶ 26-28, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(1).

## VI.  Conclusion

The Defendants' motions for summary judgment are granted as to Count I and Count IV.  They are granted in part as to Count II. And the motions are denied as to Count III.

The Plaintiff's motion for summary judgment is denied.

And the Court opts not to retain jurisdiction over a sliver of the case, as set out in Part V.

IT IS on this 5th day of September, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.